# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Dec 19 2017, 9:09 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT C.C., SR.

Joann M. Price
Merrillville, Indiana

ATTORNEY FOR APPELLANT T.C.

Deidre L. Monroe
Public Defender's Office
Gary, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of Ad.C. and Al.C., Minor Children, C.C., Sr., Father, and T.C., Mother

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

December 19, 2017

Court of Appeals Case No. 45A04-1706-JT-1363

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause Nos. 45D06-1603-JT-73 45D06-1501-JT-1

**Brown, Judge.**

[1] C.C., Sr., ("Father") and T.C. ("Mother," and together with Father, "Parents") appeal the involuntary termination of their parental rights with respect to their daughters Ad.C. and Al.C. (the "Children"). Parents each raise one issue which we restate as whether the trial court erred in terminating their parental rights. We affirm.

## Facts and Procedural History

[2] In March 2011, Parents were married. At some point in 2011, Mother's autistic son A. had bruises on him, and A. stated that Father caused the bruises. DCS initiated an informal adjustment and there was a substantiation of abuse by Father. At some later point, A.'s biological father obtained full custody of him.

[3] In October 2012, Mother, Father, their three-month-old son C.C., Jr., their fifteen-month-old daughter Ad.C., and Mother's son A. lived together. On October 10, 2012, the Department of Child Services ("DCS") received a report that C.C., Jr., had some sort of breathing episode and was transported to the hospital for further treatment. DCS learned that C.C., Jr., had suffered bilateral subdural hematomas, a subarachnoid bleed, and multiple retinal hemorrhages in both eyes.

[4] On October 11, 2012, A. and Ad.C. were removed from the home and Ad.C. was placed with her maternal grandparentsOn October 16, 2012, DCS filed a petition alleging Ad.C. to be a child in need of services ("CHINS") and that Father had stated that he was sleeping with C.C., Jr., woke up and found C.C.,

Jr., unresponsive, tried to give him CPR, stuck his finger down his throat, gently shook him to try to wake him, and later admitted that he may have shaken C.C., Jr., harder than he first indicated and may have tried to help his son for ten to fifteen minutes before calling anyone. DCS also alleged that it took custody of Ad.C. because Father's explanations were not consistent with the injuries suffered by C.C., Jr., and out of concern for the safety and well-being of Ad.C. That same day, Parents admitted the allegations. On October 17, 2012, C.C., Jr., died after Mother removed life support.

On November 30, 2012, the court ordered Father to have no contact with Ad.C. and complete a clinical assessment and anger management. That same day, the court entered a dispositional order which ordered Parents to participate in services, treatment, and/or supervision specified in the case plan.

On May 13, 2013, the court approved DCS's request for A. and Ad.C. to begin a trial home visit with Mother. On October 10, 2013, DCS filed a request for removal of A. and Ad.C. from Mother's care due to A.'s report that Mother struck him with a butterfly net and DCS observed a circular bruise on A.'s leg which appeared to be consistent with his report. The report alleged that during the trial home visit, the family resided in the home of the maternal grandparents of A. and Ad.C. On October 17, 2013, the court approved the request for removal from Mother's care and ordered A. and Ad.C. be placed with their maternal grandparents. That same day, the court ordered Parents to participate in parenting education, individual counseling, Batterer Services; ordered them to complete clinical assessments and any recommended treatment; ordered

Mother to have visitation with A. and Ad.C. supervised by the maternal grandparents in their home; and ordered Father to have supervised visitation with Ad.C. at Children's Tree House.

[7] On February 14, 2014, Father, by counsel, and DCS entered a stipulation for an adjudication of Ad.C. as a CHINS, and the court adopted the stipulation. It stated that the injuries C.C., Jr., suffered would not have occurred but for the act or omission of a parent, custodian, or guardian, and that Father was currently charged with felony criminal counts of neglect, battery, and murder.

[8] On August 14, 2014, Laura Rubino, a DCS assessment worker at the time, received a report regarding A1.C., born that same day to Parents, due to concerns that the family had current involvement with DCS regarding the death of C.C., Jr. Mother told Rubino that she planned to give A1.C. to Christina Santiago "via legal guardianship while the DCS case for her other children was still pending" and that she "wanted to avoid involvement with [A1.C.] with the Department of Child Services." Transcript Volume II at 40. Rubino was concerned about the situation because Mother informed her that she did not have any belief that Father was involved in the death of their son. DCS could not locate relative placement, and A1.C. was discharged from the hospital to a foster home. On August 19, 2014, the court held a detention hearing, and A1.C. was placed with Santiago. At some point, Santiago requested DCS to take A1.C. back, and DCS placed A1.C. with foster parents.

On December 20, 2014, DCS filed a petition to terminate the parental rights of Parents to Ad.C. On January 5, 2015, the court authorized the filing of the petition to terminate the parental rights with respect to Ad.C. On March 7, 2016, it authorized the filing of a petition to terminate the parental rights of Parents with respect to Al.C.

Meanwhile, in October 2015, a jury found Father guilty of murder, reckless homicide, battery, and neglect of a dependent. The trial court entered convictions for neglect of a dependent and battery resulting in death and sentenced Father to an aggregate sentence of twenty-nine and one-half years.[1]

On April 5 and May 4, 2017, the court held a hearing on the petitions to terminate parental rights. It heard testimony from: Tina Kozlowski, a DCS assessment case manager; Rubino, the DCS assessment worker; Karen Sheets, a case manager supervisor, parenting educator, and behavior specialist for Regional Mental Health; Judith Haney, the executive director of Children's Treehouse; Father's sister; Jordana Boton, a therapist; DCS family case manager Areca Rios ("FCM Rios"); Raisa Mays, a home-based case manager employed by Family Focus; Mother; Father; Ad.C.'s maternal grandmother; and Al.C.'s foster mother.

---

[1] Father appealed his convictions and argued that the trial court abused its discretion by admitting certain hearsay statements into evidence and that his sentence was inappropriate in light of the nature of the offense and his character. *See* No. 45A05-1601-CR-25, slip op. at 2 (Ind. Ct. App. September 20, 2016), *trans. denied*. This Court affirmed. *Id.*

[12]     Mother testified that she was at work when C.C., Jr., was injured, she has no problem with discipline or redirecting Ad.C., her divorce from Father was finalized in January 2016, she was not with anyone, and she was still having counseling, but contacting her new counselor had been very difficult. She testified that she would continue to go to therapy if the Children were returned. Mother testified that Father told her at some point that he shook C.C., Jr., but she believed that it was not a malicious act. She testified that she took Father to visitations because he could not obtain transportation through DCS.

[13]     Father testified telephonically from a correctional facility. He stated that C.C., Jr., fell asleep in bed with him, that he eventually woke up to find C.C., Jr., making gasping sounds and that he had vomit all over his onesie. He stated that C.C., Jr., was not "really responding," he stuck his finger down his throat to determine if there was anything in his airway, grabbed him, and shook him. Transcript Volume III at 17. He testified that he called Mother, that Mother told him to call 911, and that he did so. He stated that he "completed ever [sic] single service that they wanted me to complete." *Id.* at 31. He testified that he completed batterer's classes, therapy counseling, and grieving counseling prior to his criminal trial, which was held in October 2015. He also testified that he had had a job in prison but was not currently doing that job and was not job eligible at that point, and that he asked that his sister be considered for placement if his rights were terminated.

[14]     On May 19, 2017, the trial court granted the petition to terminate Parents' parent-child relationships. The order states in part:

There is a reasonable probability that the conditions resulting in the removal of the children from [the] parents' home will not be remedied in that: [Ad.C.] was removed from parental care in October 2012 after her sibling, [C.C., Jr.] (3 Months of Age) was taken to the hospital in respiratory arrest. [C.C., Jr.,] was found to have life threatening non-accidental injuries and he passed away from his injuries.

Parents were offered services pursuant to a case plan which included substance abuse assessments, parenting assessment, home based casework services, initial clinical assessments, random drug and alcohol screens, individual therapy, and supervised visitations.

The parents have a prior history with an older half-sibling, [A.] due to [Father] inappropriately disciplining the child. [A.'s] CHINS matter was dismissed after his father obtained legal custody of [A.] and is not a part of these termination proceedings.

[Father] indicated that he found [C.C., Jr.,] choking and vomiting and attempted to help the child for ten to fifteen minutes before calling 911. Father had conflicting statements as to what happened to the child. Father further indicated that he shook the child. The child had severe head trauma due to brain swelling from shaken baby syndrome. The child was on life support and was eventually removed from life support by the mother. [C.C., Jr.] passed away six days after the incident.

[A.] and [Ad.C.] were removed from parental care and placed in relative placement with the grandparents. [A.] was eventually placed with his father and his CHINS case was dismissed.

[Father] was identified as the perpetrator and was charged with Neglect of a Dependent Resulting in Death, Battery Resulting in Death, Reckless Homicide and Murder. Father . . . was arrested in February 2013.

Mother did not believe that [Father] was responsible for the injury and death of their child. Mother indicated that [Father] was innocent until proven guilty and needed a court to decide his guilt or innocence.

Mother initially cooperated and made progress with her services and was given liberal visitations with her children at her parents['] home. [Ad.C.] and [A.] were returned to mother's care in May of 2013. However, in October, 2013, the children were removed due to inappropriate physical punishment inflicted by the mother on [A.]. The children remained out of the home since that removal in October 2013.

Father was facing criminal charges regarding the death of [C.C., Jr.,] and [Mother] continued her relationship with [Father]. Mother had another child [Al.C.] in August of 2014. Mother indicated that she has given guardianship of the child to another person, Ms. Santiago. Father was present at the hospital when [Mother] had a conversation with the social worker but introduced [Father] as someone else, Ms. Santiago's husband in an attempt to elude the social worker. Even though [Mother] indicated that she has given guardianship of this child to another, [Mother] was breast feeding the child. Mother was not being truthful about the situation. The Department of Child Services took custody of that child at birth due to the serious allegations of neglect and abuse against [Father]. Mother continued to live with [Father] while he was out on bond awaiting trial. [Al.C.] was removed from parental care and custody.

Father testified telephonically from prison and indicated that he panicked when he found his son not breathing. He testified that he shook the child in an effort to get him to breathe. He further testified that he called his wife when the child was unresponsive and not 911. Father testified that he was sentenced to twenty-nine years and his earliest year of release is 2030.

Father testified that the child was born with the umbilical cord wrapped around his neck and was placed in the newborn

intensive care unit. Father further testified that the child was sick and would vomit. Father further stated that the child was taken to the doctor numerous times and the child was never diagnosed with anything. Father indicated that he was informed at his criminal trial that the child was born missing a rib. Father stated that the child had an extremely large head, but no diagnosis was ever obtained. This court is not in a position to weigh the evidence in the criminal trial. The court notes [Father] was found guilty of this crime and is currently serving his prison sentence.

Father testified that he completed counseling, grief counseling, batterer's classes and visitations through the Department of Child Services.

Father is responsible for the death of the sibling that has been proven in a court of law. Father is in no position to parent any child and will be unavailable to parent any child until the year at least 2030. Father does not have any relationship with his children due to his unavailability.

The child, [Al.C.] became a ward of [DCS]. Relative placement was explored for [Al.C.], but there were no available relatives for this child's placement. The child was placed in foster care but was eventually placed with Ms. Santiago according to [Mother's] wishes.

[Al.C.] eventually was removed from Ms. Santiago when Ms. Santiago requested the removal of the child. [Al.C.] was then placed in foster care when no viable relative was available.

Mother and Father completed parenting education in February 2014. The visitations between the parents and children were not progressing well, so hands-on parenting was initiated.

[Ad.C.] was displaying multiple behaviors including negotiating with her parents, demanding her parents what to do, throwing tantrums, throwing chairs and hitting her parents and would become so emotionally overwhelmed in the visitations that she

would self harm. [Ad.C.] was given behavioral management therapy that would teach appropriate social skills and help children manage their own emotional skills. Parents would not use their parenting skills to manage [Ad.C.'s] behaviors. [Ad.C.] was very resistant to [Father]. [Ad.C.] would not have anything to do with [Father]. [Ad.C.'s] relationship with [Mother] was better, but still not on a healthy, parent-child level. Father was very dominant and controlling in the visits with the child, and the child continued to reject [Father]. Father was dominant and controlling with [Mother] which [Mother] allowed. Father spent most of the visits with [Al.C.] and [Mother] did not have a chance to bond with [Al.C.] due to [Father] controlling the visitation with [Al.C.]. Parents continued to power struggle with the child and not parent the child. Parents were not consistent with their parenting style. The parents were not using the parenting skills that were taught. The parents were unwilling to consistently use the skills taught. The visitations were not consistent, structured or stable. Parenting education was not completed successfully for either parent.

[Ad.C.] was placed with the grandparents and the grandparents were taught the same skills needed to properly parent and control [Ad.C.'s] behaviors. The grandparents utilized the skills and [Ad.C.'s] behaviors have subsided.

Service providers had conversations with [Mother] to put more effort in her parenting skills and not to support [Father], but instead focus on reunifying with her children. Mother refused.

Father was convicted and was sentenced to twenty-nine years in prison. Father is and will be unavailable to parent these children.

Mother's therapist, Ms. Boton testified that she attempted to provide therapy for [Mother], but [Mother] would not attend the sessions. Mother missed fifteen out of the 24 sessions scheduled in a six month time period. Mother only attended nine scheduled sessions. The therapy sessions were conducted in [Mother's] home. Mother indicated to the therapist that she has

suffered numerous traumas throughout her lifetime that went unresolved. Mother suffered from depression from her teenage years until present. Mother was very resistant to the therapy and did not participate in the sessions. Four[] years into the CHINS cases, and [Mother] is still in denial of [Father's] responsibility in the death of her son. Mother's therapist testified that [Mother] was erratic in her emotions. Mother has not addressed her therapeutic needs. The therapist testified that on one occasion she was in the home and [Mother's] teenage son made inappropriate comments to the therapist. Mother did not redirect her son or address the situation. Mother did not utilize any parenting skills. The therapist left the home due to the fifteen minutes of inappropriate comments that were not being addressed.

Mother has a sense of paranoia and a distorted reality. Mother's mental state is in question and is not being adequately addressed. Mother indicated that she was diagnosed at an early age with bipolar but is not being treated for any mental instabilities. Mother was given a psychiatric evaluation to which she was again diagnosed with bipolar and was given medication. Whether [Mother] actually takes the medication is unknown. Mother's years of unaddressed trauma has [her] at a greater risk for harming her children or being unable to keep her children safe. Mother is not able to protect her children. Ms. Boton, the therapist testified that [Mother] would need years of therapy to address all the traumas in her life.

Mother was up and down with her consistency and her compliance with the services. Mother was participating in the visitations with the children but the visitations were contentious and [Mother] would state inappropriate comments to the children that would disrupt the stability that they have obtained in their lives. Visitations ceased in July of 2016 due to [Mother's] non-compliance and [Mother's] inconsistency with the services. Mother has been receiving services for over four years and [Mother] was no closer to reunification than she was when the

Department of Child Services first became involved. Mother was given the therapeutic services, the psychiatric services, the parenting services and [she] has not progressed in any of the services.

Mother has never put her children first. Mother did not leave [Father] until after he was convicted of the death of their child. Mother filed for divorce three days after he was convicted. There was a no contact order between [Father] and the children, but [Mother] continued a relationship with [Father]. The children were unable to be placed with [Mother] as long as [Father] and [Mother] were together. Father remained in [Mother's] life, and the children remained in placement.

Mother testified that she now believes that [Father] did create the injury to her son. Mother testified that she believes it was poor judgment on [Father's] behalf. Mother has not put her children first. Now, that [Father] is in prison and sentenced to twenty-nine years, [Mother] broke her relationship with [Father], although probably not intentionally, got a divorce and now indicates she will do anything to be reunified with her children. Four years later.

Grandmother, [Mother's] mother testified that [Mother] has been struggling with mental health issues her entire life. Grandmother testified that [Mother] was diagnosed with bipolar disorder. Grandmother stated that [Mother] herself was a ward of the Department of Child Services previously during her youth and was residentially placed for two years. Grandmother testified that [Mother's] mental issues have not been addressed.

The Court cannot dismiss the four years of stability and the years of bonding and permanency that the children have achieved. The Court must put these children first.

[Al.C.] is two years of age and was placed outside parental care at four days old. The child remained in her current home for the entire time except for a brief attempt of failed reunification.

Mother has been offered all services available in an effort for [her] to properly and safely parent her children. All services have failed. Mother has not taken advantage of the services offered. Services were provided to [Mother] for over four years. The needs of the children outweighs the right of the parents to parent their children. The children deserve permanency and stability and the children have obtained it in their current placements. It is in the children's best interest to maintain their placements and the bonds they have created. It would be detrimental to the best interests of the children to disrupt the stability of their current placement.

Neither parent is providing any emotional or financial support for the children. Neither parent has completed any case plan for reunification. Neither parent is in a position to properly parent these children. Father is incarcerated and will be for numerous years. The children are in placement and are bonded and thriving. [Al.C.] has been in placement since birth and has never been in parental care or custody. [Ad.C.] has been in placement with her grandparents[] for almost four years. The Court notes [Ad.C.] is five years old. [Ad.C.] has spent the majority of her life with her grandparents.

There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children . . . for the reasons stated above. Additionally, the children deserve a loving, caring, safe and stable home.

It is in the best interest of the children and [their] health, welfare and future that the parent-child relationship between the children and [their] parents be forever fully and absolutely terminated.

The Indiana Department of Child Services has a satisfactory plan for the care and treatment of the children which is Adoption by the foster parents . . . for [Al.C.] and adoption by the grandparents . . . for [Ad.C.].

Father's Appendix Volume II at 2-7.

## Discussion

[15] The issue is whether the trial court erred in terminating Parents' parental rights. Father argues that there is a reasonable probability that the reasons for the Children's removal have been remedied and points to his participation in services including parenting classes, counseling, and visitation. He asserts that he had never been trained in infant CPR prior to his services and such training "would have either greatly reduced or eliminated [his] 'knee-jerk' response" to the health crisis of C.C., Jr., that resulted in his death. Father's Brief at 12. Father argues that he has positioned himself to be a financial support to the Children. He contends that he does not pose a threat to the Children's well-being and points to his participation in services and his bond with the Children. Father also argues that termination is not in the Children's best interest, there was no satisfactory case plan, and appears to argue that the Children should be placed with his sister.

[16] Mother contends that the court erred in finding that there was a reasonable probability the conditions that resulted in removal of the Children would not been remedied. She argues that she made progress with her services and, at the time of the termination hearing, was divorced from Father, working, residing in suitable housing, and continuing to seek therapy for her issues. She asserts that the court erred in finding a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children and that there was no evidence that she ever harmed the Children while they were in her care and custody. She also argues that termination is not in the

Children's best interests and they should be afforded the opportunity to be raised or at least have a relationship with her. **(Mother's Brief at 14)**

In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[2]  If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship.  *See* Ind. Code § 31-35-2-8(a).

The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-

---

[2] Subsequently amended by Pub. L. No. 42-2017, § 2 (eff. July 1, 2017).

1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[19] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require*s the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a

case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640.

A. *Remedy of Conditions*

[20] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[21] In determining whether the conditions that resulted in the Children's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.*

Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

"The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.* "Indiana courts have upheld parental rights of incarcerated parents who still had a year or more to serve before possible release," and the Indiana Supreme Court has "not established a bright-line rule for when release must occur to maintain parental rights." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 648 (Ind. 2015). "Because the release date alone is not determinative, we consider whether other evidence, coupled with this consideration, demonstrates by clear and convincing evidence a reasonable probability that [an incarcerated parent] would be unable to remedy the conditions for removal." *Id.*

[22] To the extent Parents do not challenge the court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind.

Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[23]    With respect to Father, the record reveals that Father was convicted of neglect of a dependent and battery resulting in death and sentenced to an aggregate sentence of twenty-nine and one-half years with an earliest release date of 2030. We observe that this offense occurred while Ad.C. was fifteen months old and resulted in the death of one of Father's other children.

[24]    As for Mother, Tina Kozlowski, a DCS assessment case manager, testified that Mother was devastated following the death of C.C., Jr., and said "I'll never forgive [Father] if he did this." Transcript Volume II at 25. She testified that Mother later began having doubts that Father could have caused the injuries and did not want to believe that he did. Rubino testified that she could not leave Al.C. with Mother because of a concern regarding Mother's repeated admission that she did not believe Father was the alleged perpetrator in the death of C.C., Jr. She also testified that Father, who was out on bond at the time of Al.C.'s birth, was introduced by Parents in the hospital following her birth as Santiago's husband to the hospital social worker in an attempt to "fool the social worker." *Id.* at 42.

[25]    Sheets, the case manager supervisor, parenting educator, and behavior specialist for Regional Mental Health, testified that Mother's lack of success in her program was due to Mother's unwillingness or inability and that Mother did

not want to engage in the hands-on parenting portion of education at some point. She also stated:

> It became clear that she wasn't really utilizing the skills and so it was kind of was like maybe the focus would be better spent on just behavior management for [Ad.C.] rather than the hands-on parenting with [Mother], because after all this time, well certain things were better, we did not achieve the outcomes that we had hoped for.

*Id.* at 88. She testified that she was not sure that Mother could keep Ad.C. safe and expressed concern regarding Mother's inability to recognize that Father harmed their baby intentionally in light of the injuries.

[26] Haney, the Executive Director of Children's Treehouse, testified that Mother improved "along the way, but it seemed to always go back" and "[r]egress to the way it had been prior." *Id.* at 103. She also testified that there was very little progress.

[27] Boton, the therapist, testified that she actively attempted to provide services to Mother between August 2016 and February 2017. Boton's goal was to meet with Mother twenty-four times, but Mother missed fifteen appointments and gave Boton various reasons including her son had different ailments, she had different ailments, conflict of scheduling, and she had different appointments. Boton testified that Mother had reported being molested by her stepfather, that she had been diagnosed with bipolar disorder, and that she had suffered from depression. Boton testified that Mother was "very resistant," "did not actively participate in her sessions to get the services what they were meant for, meant

for her," and that her level of resistance was abnormal. *Id.* at 138. Boton also testified that Mother's emotional stability and her ability to perceive the situation accurately concerned her and that she believed Mother was still in denial of what happened to C.C., Jr. Boton further stated that Mother alleged that DCS was recording her at her home, in her car, on her way to work, and in the community setting, and that "paranoia is setting in." *Id.* at 144.

[28] When asked why DCS had not been able to place the children back with Mother, FCM Rios testified that visitation had become contentious. She also stated:

> The major concern for the Department is that there was a refusal to secure that environment for both of the other children. In particular, with the situation with [Al.C.] and knowing that [Father] was in the situation that he was in and that the parents remained together despite the fact that there was a no contact for the children. So, not – [Mother] did not – refusing to believe that those are the things that happened, despite a criminal conviction, is a concern. It's a concern for the Department that the needs of others came before the needs of her children. And so that remains a concern today.

*Id.* at 159. She testified that, while Mother filed for divorce from Father, this did not occur until three days after the conviction and that "[i]t's important because the conversation had happened prior and the conversation had been put on the table prior, about the importance of keeping [Father] away from the kids, keeping the children safe. And that simply did not happen until it had to happen." *Id.*

Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a reasonable probability that the conditions leading to the Children's removal will not be remedied. *See In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005) (concluding that the trial court properly terminated the parent-child relationship where a parent participated in but failed to benefit from services).

B. *Best Interests*

We next consider Parents' assertion that DCS failed to demonstrate that termination of their parental rights was in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. Recommendations of the case manager and court-appointed advocate, in

addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied*.

[31]     When asked about Ad.C.'s best interests, Sheets testified that she witnessed a scene that repeated itself several times during visitation in which Ad.C. would play with a baby doll, say that the baby threw up in her bed, pick up the baby doll, shake it, say "Bad, baby," throw the baby in the corner, and say "I'll get a new baby." Transcript Volume II at 75. When asked what observations or experience she had that would support adoption as being in Ad.C.'s best interest, Sheets answered:

> Well, there were several things that occurred during the course of the case that I observed. One, was that [Mother] and I had conversations about the, you know, maybe it would be in the best interest of the children, for [Mother] to not support [Father], work harder on her parenting skills, and getting the children placed back into her care. [Mother] was not willing to do that. She wanted to stay with [Father] and support him through the criminal trial, even though that meant not having her children with her. [Mother] did not notice [Ad.C.'s] resistance and reluctance to have contact or physical touching or even wanting to play with [Father]. [Mother] did not notice that until I called that to her attention. She didn't seem to think that that was a problem. So, my concern there would be that [Mother] is not able to recognize what her child needs. Or when someone may present a danger or a safety concern to her child. In conversations with [Mother], it almost seems as if [Mother] has an inability or an ability to change the way she views reality to make it fit what she needs or what she wants. That she can't see

things as they really are, as they really present. So, that causes me great concern for [Ad.C.]. And [Ad.C.] is, as I said, very bright. So, she could be challenging.

*Id.* at 78-79. FCM Rios testified that she recommended that the court terminate the parental rights of Parents.

[32] Based on the testimony, as well as the totality of the evidence in the record and as set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of the Children is supported by clear and convincing evidence.

C. *Satisfactory Plan*

[33] With respect to Father's argument that the evidence did not demonstrate there was a satisfactory plan for the care and treatment of the Children, we disagree.[3] This Court has held that adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (citing *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*.

---

[3] Mother concedes that DCS provided clear and convincing evidence that they have a satisfactory plan for the future care and treatment of the Children.

[34] Initially, we observe as to other possible placements for the Children, FCM Rios testified that Mother had wanted Al.C. to be placed with Santiago, but Santiago actually requested DCS to take Al.C. back because "[i]t was too much, she cried a lot, I think she was a colicky baby and she did not wish to keep her." Transcript Volume II at 164. FCM Rios also testified that Father's sister contacted her for the first time in January 2017, that Father's sister indicated that Al.C. and Ad.C. were young and they would "get over" being removed from their placements, and that she did not know Al.C.'s name. *Id.* at 165.

[35] Ad.C.'s maternal grandmother testified that Ad.C. had been in her home since October 2012 when Ad.C. was fifteen months old and that Ad.C. had bonded with her and her husband. She testified that Ad.C. was doing fairly well and had done very well with her behavior at school.

[36] Al.C.'s foster mother testified that she had Al.C. in her care since she was four days old except for a period of two months early on when Al.C. was placed somewhere else. She testified that Al.C. had very much bonded with her and her whole family and that Al.C. calls her mommy. She also testified that she was in touch with the biological grandparents, that Ad.C. and Al.C. have met, and that "we want to make sure we keep that relationship open." Transcript Volume III at 81.

[37] Sheets testified that Ad.C.'s grandparents were very receptive to using certain skills and wording with Ad.C. and were successful in managing Ad.C.'s

behaviors at home. Sheets described that Ad.C.'s current placement with her grandparents as stable with consistent parenting and a "very good environment." Transcript Volume II at 82. Sheets testified:

> And the grandparents are able to be consistent with her. They are loving, yet they are firm. They do fun, wonderful things with her, but they also make sure that she goes to bed on time, that she eats healthy, that she goes to school. That she is not allowed to get physically aggressive. If she does try things, negative behaviors, there are consequences for those, but they are not punitive consequences, they are logical or natural consequences for the behaviors. And if they have any kind of concern or, hey, what's going on here, you know, they always call either Areca or myself or both of us. Just to let us know what is happening within the family, if there is something new going on with [Ad.C.].

*Id.* at 79.

[38]     FCM Rios testified:

> [Al.C.] has been where she is with the exception of a very short period of time, I believe for about two and a half months. She has been her entire life at the foster home she's in now. She's developed a very strong bond to the foster family. [Ad.C.] is with her grandparents. She identifies them as her family. She does very well in that environment. I believe the children are in the best possible circumstances that they could be in. Clearly, [Ad.C.] will maintain her essential connections being in grandma's house. So she still has access to her family. [Al.C.] is in a foster home and they are not blood relatives, but the sisters do see each other, so I mean, she's not been disconnected from the family in the way that I think people automatically assume

> when kids are separated. So, I do believe that the situations that they're in are the best situations for them to achieve permanency.

*Id.* at 163-164.

[39] FCM Rios further testified that DCS made attempts to place the children together, but "due to a multitude of circumstances and I believe a big part of it was that [the maternal grandparents] were just physically unable to take on another child, and that was when [Al.C.] went to foster care." *Id.* at 175. FCM Rios testified that the quality of care in the maternal grandparents' home where Ad.C. was placed was "very good, excellent," that she has a good relationship with grandmother, and that there did not seem to be any issues in the home with Ad.C. and her grandparents. *Id.* at 166. She also described the quality of care in Al.C.'s foster home as excellent and that Al.C. was very bonded to her foster brother. When asked about maintaining the relationship between Al.C. and Ad.C., FCM Rios answered:

> Well, [the maternal grandmother] and [the foster mother] had spoken and they see each other at court and things of that nature and they really wanted to get the girls together, so that is something that they started doing. That they would like to plan on continuing doing with this if this takes the adoption road. Both grandma and foster mom feel that the sisters shouldn't be kept from each other, so they intend to keep that relationship intact.

*Id.* at 168. She also testified that the grandparents wish to adopt Ad.C. and the foster parents wish to adopt Al.C. The record and the court's findings support

the court's conclusion that adoption is a satisfactory plan for the care and treatment of the Children.

## Conclusion

We conclude that the trial court's judgment terminating the parental rights of Parents is supported by clear and convincing evidence. We find no error and affirm.

Affirmed.

Najam, J., and Kirsch, J., concur.